**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CHARITY A. ORTIZ**, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**CROWN CORK AND SEAL COMPANY, INC.**,<br><br>Defendant. | Civil Action No.:<br><br><br>**CLASS ACTION COMPLAINT** |

Plaintiff, Charity A. Ortiz ("Plaintiff"), individually and on behalf of the Class defined below of similarly situated persons, alleges the following against Crown Cork and Seal Company, Inc. ("Crown" or "Defendant"), based upon personal knowledge with respect to herself and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters:

**NATURE OF THE ACTION**

1.      It is both unfair and unlawful for entities like Crown to impose discriminatory and punitive health insurance surcharges on employees who use tobacco products without making available a reasonable alternative standard to avoid those surcharges. This lawsuit challenges Defendant's unlawful practice of charging a tobacco surcharge under the CC&S Group Health Plan (the "Plan") in a manner that violates the Employee Retirement Income Security Act of 1974 ("ERISA") and the implementing regulations. ERISA permits health-contingent wellness programs that promote health if, and *only if*, such programs strictly comply with the criteria governing these programs, including: (i) making available a meaningful and accessible reasonable

1

alternative standard to any individual being charged extra based on a health factor; (ii) clearly disclosing the availability of that alternative standard, the means to access it, and the right to a physician-directed alternative in "all plan materials" describing the surcharge; and (iii) making available the "full reward" to all participants who satisfy the reasonable alternative standard, including retroactive reimbursement of surcharges paid while completing the alternative. 29 U.S.C. § 1182(b)(2)(B); 42 U.S.C. § 300gg-4(j). Crown does not do these things. Instead, it imposes a discriminatory $100 monthly tobacco surcharge while failing to make available a compliant reasonable alternative standard, failing to notify participants of the "full reward" or any avenue to obtain it, and failing to provide the required physician-accommodation statement— violating federal regulations and depriving employees of benefits to which they are entitled under ERISA.

2.      Tobacco surcharges have become more prevalent in recent years but, to be lawful, plans must make available a compliant "wellness program" that provides employees with an avenue to avoid the surcharge. Making a compliant wellness program available means employers *must* adhere to strict rules set forth by ERISA and the implementing regulations established by the Departments of Labor, Health and Human Services, and the Treasury (collectively, the "Departments") over ten years ago in 2014. ERISA imbues the Departments with the authority to promulgate regulations interpreting ERISA § 702, 29 U.S.C. § 1182, the statute's non-discrimination provision. Accordingly, the Departments have developed a regulatory framework that "must be satisfied" to qualify for the statutory exception or safe harbor. Employers can only invoke this safe harbor if they can demonstrate full compliance with all the requirements.

3.      ERISA's strict regulatory requirements are meant to ensure that wellness programs actually promote health and preclude discrimination, instead of wellness programs that are

"subterfuge[s] for discriminating based on a health factor."[1] The Final Regulations establish that for plans to be compliant, an employer must provide a clearly defined, reasonable alternative standard that allows participants to obtain the "full reward," including retroactive reimbursement of surcharges paid while completing the alternative standard; plans must also provide proper notice to all participants. *See id.*, 33159–63. First and foremost, a wellness program must be genuinely designed to improve health or prevent disease, rather than functioning as an improper penalty imposed on certain participants under the guise of a health initiative. Crown's Plan fails to clearly establish a reasonable alternative standard, imposes a $100 monthly surcharge on all tobacco users, does not disclose a compliant mechanism by which a participant who completes a cessation program mid-year may obtain the "full reward," fails to provide proper notice disclosures in "all plan materials" discussing the surcharge, and unlawfully shifts costs onto employees in violation of ERISA's wellness program regulations.

4.      The need for regulatory safeguards surrounding these types of wellness programs is underscored by studies showing little evidence that wellness programs effectively reduce healthcare costs through health improvement. Instead, the savings employers claim often result in cost-shifting onto employees with higher health risks, disproportionately burdening low-income and vulnerable workers who end up subsidizing their healthier colleagues.[2] The regulatory

---

[1] *Incentives for Nondiscriminatory Wellness Programs in Group Health Plans*, 78 Fed. Reg. 33158, 33163 (June 3, 2013) (hereinafter the "**Final Regulations**").

[2] Horwitz, J. R., Kelly, B. D., & DiNardo, J. E. (2013). *Wellness incentives in the workplace: Cost savings through cost shifting to unhealthy workers*. Health Affairs, 32(3), 468–476, 474 ("wellness programs may undermine laws meant to prevent discrimination on the basis of health status. Since racial minorities and people with low socioeconomic status are more likely than others to have more health risks, they are also more likely to be adversely affected by cost shifting"); *see also* Dorilas, E., Hill, S. C., & Pesko, M. F. (2022). *Tobacco surcharges associated with reduced ACA marketplace enrollment*. Health Affairs, 41(3), Abstract (finding that tobacco surcharges are significant barriers to affordable health insurance).

safeguards seek to prevent wellness programs from being misused as thinly veiled revenue-generating schemes at the expense of employees who are least able to afford the additional costs by shifting the burden to plan sponsors to demonstrate compliance once a participant alleges discriminatory surcharges. The goal is to ensure that wellness programs operate equitably and in a non-discriminatory manner, and to promote genuine health improvements.

5.    Outcome-based programs,[3] such as being tobacco-free or completing a smoking cessation program, must offer a clearly defined "*reasonable* alternative standard," which is an alternative way for "all similarly situated individuals" to obtain the reward (or avoid a penalty) if they are unable to meet the initial wellness program standard (i.e., being tobacco-free). Critically, ERISA's implementing regulations require that "the *same*, *full reward*" must be provided to individuals who complete the alternative standard, regardless of when they do so during the plan year.[4] The Department of Labor ("DOL") has made clear that participants should not be forced to rush through the program under the threat of continued surcharges and that every individual participating in the program must receive the same reward as provided to non-smokers. *Id.* The Departments made this requirement clear when they stated it is "[t]he intention of the Departments . . . that, regardless of the type of wellness program, ***every individual participating***

---

[3] "An outcome-based wellness program is a type of health-contingent wellness program that requires an individual to attain or maintain a specific health outcome (such as not smoking or attaining certain results on biometric screenings) in order to obtain a reward." 29 C.F.R. § 2590.702(f)(1)(v).

[4] *See* Final Regulations, 33163 ("while an individual may take some time to request, establish, and satisfy a reasonable alternative standard, ***the same, full reward must be provided to that individual*** as is provided to individuals who meet the initial standard for that plan year. (For example, if a calendar year plan offers a health-contingent wellness program with a premium discount and an individual who qualifies for a reasonable alternative standard satisfies that alternative on April 1, the plan or issuer must provide the premium discounts for January, February, and March to that individual.)" (emphasis added)).

*in the program* should be able to receive ***the full amount of any reward or incentive*** *. . ..*" *Id.,* 33160 (emphasis added). Defendant violates these requirements by failing to make available a *reasonable* alternative standard that provides full reimbursement to employees who complete it, operating a non-compliant penalty structure rather than a lawful wellness incentive, and failing to clearly notify participants of all the avenues available to them to avoid the surcharge, including benefit guides, plan documents, and summary plan descriptions ("SPDs"). *Id.* These failures constitute direct violations of ERISA's wellness program regulations.

6.      Defendant cannot qualify for the statutory safe harbor because, while it imposes a health-based surcharge, it does not comply with the requirements for a lawful wellness program. The Plan fails to satisfy the essential regulatory criteria, which "***must*** be satisfied," (*id.*, 33160; emphasis added) for a wellness program to be lawful under ERISA. 78 Fed. Reg. at 33160. Its core deficiency is that it does not make available a reasonable alternative standard that provides the "full reward" to all similarly situated individuals who complete it, as required by 42 U.S.C. § 300gg-4(j)(3)(D) and 45 C.F.R. § 146.121(f)(4)(iv). Although Crown's SPD identifies a tobacco cessation program, a participant-facing document discussing frequently asked questions regarding the tobacco surcharge clearly states that if a participant changes tobacco use status during the year, "[t]he surcharge will be removed going forward. **Refunds for past payroll deductions are not issued.**" Those who complete an alternative, "[u]pon providing a certificate of completion" can have "the surcharge … removed for the remainder of the plan year." And if a participant obtains a medical waiver, the surcharge is removed only "for the remainder of the current plan year." In each of these scenarios, Crown pockets every surcharge dollar collected in the months preceding the participant's satisfaction of the alternative standard, directly contravening the full reward rule.

7.      The result is that Crown's program creates two classes of similarly situated tobacco-free participants: those fortunate enough to have already been tobacco-free at open enrollment, who receive the full annual reward; and those who become tobacco-free during the plan year—by completing Crown's own cessation program, by achieving six months of tobacco-free status, or by obtaining a physician's medical waiver—who receive a materially diminished reward. That is exactly the disparity ERISA's wellness program rules were designed to prevent.

8.      Defendants also violate ERISA's wellness program regulations by failing to provide the required notice, an independent basis for liability. Federal law requires that a plan "disclose *in all plan materials* describing the terms of the wellness program the availability of a reasonable alternative standard." 42 U.S.C. § 300gg-4(j)(3)(E) (emphasis added); *see also* 29 C.F.R. § 2590.702(f)(4)(v). The alternative standard Defendant identifies in its participant materials is not a reasonable alternative standard, because it does not make available the full reward to all similarly situated participants who complete it. The materials also reference a physician-obtained waiver, but nowhere disclose that the waiver entitles the participant to the same financial benefit as a non-tobacco user, and nowhere disclose that participants may design a physician-directed alternative standard. Worse, the physician-accommodation language Defendant does provide is tethered exclusively to participants for whom quitting is "unreasonably difficult due to a medical condition" or "medically inadvisable." That is the wrong legal standard. Before 2013, plan-level accommodations for wellness programs reached only that narrow medical-hardship subset. The 2013 rulemaking changed the law: for outcome-based wellness programs, a plan must make a reasonable alternative standard available to any participant who does not meet the initial standard, regardless of medical hardship, and must disclose that "recommendations of an individual's personal physician will be accommodated" as to all such participants. 29 C.F.R.

6

§ 2590.702(f)(4)(iv)–(v); *see also* 78 Fed. Reg. 33158, 33161–63 (June 3, 2013). Defendant's notice, which cabins the accommodation to the pre-2013 medical-hardship subset, is not the notice ERISA requires today.

9.      Upon information and belief, additional Plan materials distributed to participants describing or implementing the tobacco surcharge, including the Plan's annual benefits guide and informative documents discussing the tobacco surcharge, fail to include the disclosures required by 42 U.S.C. § 300gg-4(j)(3)(E) and 29 C.F.R. § 2590.702(f)(4)(v). Upon information and belief, these additional materials are participant-facing, discuss the terms of the program, including information on the rates, to whom the surcharge applies, and the availability of a cessation program, but do not disclose that completion of the cessation program during the Plan year entitles a participant to relief from surcharges already assessed. Further, these additional participant-facing materials fail to include the required physician-accommodation statement. These notice failures, considered together with the SPD's defective disclosure, independently violate ERISA's wellness program regulations.

10.     These disclosure failures are not technical defects. The Final Regulations make clear that where a plan imposes a premium differential based on tobacco use, its disclosures must include notice of the availability of a reasonable alternative standard and of an option to involve participants' physicians. *See* 78 Fed. Reg. at 33166 ("a plan disclosure that references premium differential based on tobacco use . . . must include this disclosure"). Proper notice is critical because failing to notify participants can chill engagement with the program of health promotion and deter participants from taking steps to better their health. Because Crown's Plan materials do not contain these required disclosures, Crown cannot invoke ERISA's wellness program safe

7

harbor as an affirmative defense. The tobacco surcharge imposed through the Plan therefore constitutes unlawful discrimination based on a health-status-related factor in violation of ERISA

11.    Because Crown imposes a $100 monthly tobacco surcharge and does not make available a compliant reasonable alternative standard or provide the required notice in *all* Plan materials discussing the surcharge, the Plan fails to satisfy the essential regulatory criteria, which "must be satisfied." *Id.* at 33160. As a result of these deficiencies, Defendant cannot take advantage of the statutory safe harbor and, therefore, the surcharge functions as a penalty rather than a compliant wellness incentive. Deficient and misleading notice is a fundamental violation of ERISA's core anti-discriminatory purpose: ensuring that participants have a fair and compliant opportunity to be treated the same as non-smokers.

12.    This Complaint alleges that Crown imposes a health-based tobacco surcharge without making available a compliant alternative standard to avoid the surcharge and without providing required notice. Crown bears the burden of proving that its tobacco surcharge is lawful by showing that its wellness program fully complies with every requirement under ERISA. Charging participants a tobacco surcharge while not informing them of a reasonable alternative standard that makes available the "full reward," and failing to provide proper notice, makes the surcharge facially noncompliant. No amount of post hoc justifications can cure these fundamental defects. This type of premium differential is permissible only if employers meet strict criteria, which Crown does not. Crown's Plan is not a "program[] of health promotion or disease prevention" as required by ERISA but instead an impermissible cost-shifting scheme that unlawfully penalizes employees for their health status.

13.    Participants like Ms. Ortiz are permitted to challenge a surcharge when a non-compliant wellness program is made available in place of a reasonable alternative standard or when

employers provide deficient or misleading information. Once a participant alleges that a surcharge violates ERISA's anti-discrimination provisions along with facts showing the specific deficiencies in the wellness program, the burden shifts to the employer, Crown, to demonstrate that its wellness program fully satisfies all the statutory and regulatory criteria, including the obligation to make available the "full reward" and to notify participants of the same. *See Cunningham v. Cornell Univ.*, 604 U.S. 693, 702–04 (2025) (reaffirming that "the burden of persuasion as to certain elements of a plaintiff's claim may be shifted to defendants, when such elements can fairly be characterized as affirmative defenses or *exemptions*." (emphasis in original)).

14.     Plaintiff is a former employee of Crown who paid the unlawful tobacco surcharge to maintain health insurance coverage under the Plan. This surcharge imposed an additional financial burden on Plaintiff, and continues to impose such a burden on those similarly situated.

15.     Plaintiff brings this lawsuit individually and on behalf of all similarly situated Plan participants and beneficiaries, seeking to recover these unlawfully charged fees and for Plan-wide equitable relief to prevent Defendants from continuing to profit from their violations under 29 U.S.C. § 1109. Under 29 U.S.C. § 1109, Defendants are fiduciaries of the Plan who have a legal obligation to act in the best interests of Plan participants and to comply with federal law. Plaintiff, on behalf of herself and the Plan as a whole, seeks appropriate equitable relief under 29 U.S.C. §§ 1132(a)(2) and (a)(3) to address Defendants' ongoing violations of ERISA's anti-discrimination provisions.

## PARTIES

16.     Plaintiff is, and at all times mentioned herein was, an individual citizen of the State of Minnesota. Plaintiff is a former employee of Crown, who paid a tobacco surcharge of $100

monthly surcharge under the Plan. Plaintiff was required to pay this tobacco surcharge to maintain health insurance under the Plan.

17.    Plaintiff is a participant in the Plan pursuant to 29 U.S.C. § 1002(7).

18.    Defendant Crown Cork & Seal Company, Inc. ("Crown") is a Pennsylvania corporation. Crown, through its parent, subsidiaries, and affiliates, is a global packaging company that supplies rigid packaging products, including beverage cans, food cans, aerosol cans, closures, promotional packaging, and related packaging products and services to customers throughout the United States. Crown is the Plan sponsor within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B). Crown exercises discretionary authority and control over the management and administration of the Plan, including the design, implementation, and communication of the tobacco surcharge, and is therefore a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). At all relevant times, Crown employed thousands of employees and maintained a Plan covering a substantial number of participants and beneficiaries. The Plan is an employee welfare benefit plan subject to ERISA, 29 U.S.C. § 1002(1) and (3). The Plan is not a party to this action; Plaintiff sues Crown in its capacity as fiduciary and Plan Administrator.

## JURISDICTION AND VENUE

19.    The Court has subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331, as this suit seeks relief under ERISA, a federal statute. Upon information and belief, the number of class members is over 1,000, many of whom have different citizenship from Defendant. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

20.    This Court has personal jurisdiction over Defendant because Defendant is headquartered in and has significant operations in this District, Plaintiff's claims and the claims of all others similarly situated arise from the acts and omissions of Defendant with respect to its

activities and conduct concerning Plaintiff in Pennsylvania, and Defendant has purposefully availed itself of the privilege of conducting business in Pennsylvania.

21.     Venue is proper in this District pursuant to 29 U.S.C. § 1132(e)(2) because the Plan is administered in this District, Crown maintains its principal place of business and conducts business in this District, and Defendant has substantial contacts with and may be found in this District.

**FACTUAL BACKGROUND**

I.     **DEFENDANTS' TOBACCO SURCHARGE VIOLATES ERISA'S ANTI-DISCRIMINATION RULE**

A.  **Statutory and Regulatory Requirements**

22.     ERISA prohibits any health insurer or medical plan from discriminating against participants in providing coverage or charging premiums based on a "health-related factor," including tobacco use. Under this rule, a plan "may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution that is greater than such premium or contribution for a similarly situated individual enrolled in the plan based on any health-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual." ERISA § 702(b)(1), 29 U.S.C. § 1182(b)(1); 42 U.S.C. § 300gg-4(b)(1).

23.     The statute permits group health plans to "establish[] premium discounts or rebates . . . in return for adherence to *programs of health promotion and disease prevention*" (29 U.S.C. § 1182(b)(2)(B) (emphases added)); however, these "wellness programs"—to qualify for this statutory safe harbor exception—must strictly adhere to the mandated regulatory requirements.

24.     Congress directed the Departments to issue regulations, including the power to establish regulations prohibiting discrimination against participants and beneficiaries based on

their health status under 29 U.S.C. § 1182, and 42 U.S.C. § 300gg-4. *See* 29 U.S.C. §§ 1135 and 1191c, 42 U.S.C. §§ 300gg-4(n) and 300gg-92. This authority empowers the respective Secretaries to prescribe regulations as necessary or appropriate to carry out the provisions of Title I of ERISA.

25.     Exercising this delegated authority, in 2006, the Departments issued regulations through the notice-and-comment rulemaking process outlining the criteria that a wellness program must meet to qualify for the premium non-discrimination exception under ERISA § 702(b). *See* Final Regulations, 33158–59. Then, in 2010, Congress adopted the language of the 2006 version of the regulations nearly verbatim, except in one notable way: Congress added the word "full" to modify "the reward" that had to be made available to those in a wellness program. *Compare* 71 Fed. Reg. 75014, 75036 (2006) ("The reward under the program must be available to all similarly situated individuals") *with* 42 U.S.C. § 300gg-4(j)(3)(D) ("The ***full*** reward under the wellness program shall be made available to all similarly situated individuals"). After that, in November 2012, the Departments operationalized the statutory language with an improved regulatory framework that was approved and signed in 2013 to be effective January 1, 2014. 78 Fed. Reg. at 33158–60.

26.     The Final Regulations specify that health promotion or disease prevention programs, such as outcome-based wellness initiatives (i.e., smoking cessation programs), must meet detailed requirements to qualify for the statutory safe harbor. As the Departments explained, these criteria "***must be satisfied*** in order for the plan or issuer to qualify for an exception to the prohibition on discrimination based on health status." *Id.*, 33163 (emphasis added). "That is," the Departments explained, "these rules set forth criteria for an ***affirmative defense*** that can be used by plans and issuers in response to a claim that the plan or issuer discriminated" against participants. *Id.* (emphasis added). That means once a participant alleges a discriminatory

surcharge along with facts showing that the alternative standard offered to them is deficient, the burden then shifts to the employer to prove that the wellness program satisfies *all* the necessary criteria.

27.     The criteria in the Final Regulations are not optional. They serve as the only lawful pathway for plans to impose health-based premium differentials by ensuring that wellness programs do not arbitrarily penalize participants and prevent employers from using surcharges as a revenue-generating mechanism rather than a genuine tool for health promotion. If a wellness program fails to meet even one of these stringent requirements, the program is noncompliant and the employer cannot benefit from the statutory carve-out. *See* § 2590.702(f)(4) (describing the "[r]equirements for outcome-based wellness programs," stating that a program "does not violate the provisions of this section ***only if all of the [] requirements are satisfied***." (emphasis added)).

### B.  Regulatory Criteria

28.     To comply with ERISA and avoid unlawful discriminatory surcharges, outcome-based wellness programs must meet the following five (5) criteria:

(a) Frequency of opportunity to qualify: Participants must be given at least one chance annually to qualify for the reward associated with the program to ensure ongoing accessibility and fairness. 29 C.F.R. § 2590.702(f)(4)(i).

(b) Size of reward: Penalties or rewards cannot exceed 50% of the cost of employee-only coverage. § 2590.702(f)(4)(ii).

(c) Reasonable design: Programs must be "reasonably designed" to promote health and cannot be "a subterfuge for discriminating based on a health factor." This determination is based on all the relevant facts and circumstances. "To ensure that an outcome-based wellness program is reasonably designed to improve health and does not act as a

subterfuge for underwriting or reducing benefits based on a health factor, a reasonable alternative standard to qualify for the reward must be provided to any individual who does not meet the initial standard based on a measurement, test, or screening. . . .” § 2590.702(f)(4)(iii).

(d) Uniform availability and reasonable alternative standards: “The full reward under the outcome-based wellness program must be available to all similarly situated individuals.” § 2590.702(f)(4)(iv).

(e) Notice of availability of reasonable alternative standard: Notice must include (a) instructions on how to access the reasonable alternative standard; (b) contact information for inquiries about the alternative standard; and (c) an explicit statement that participants’ personal physician’s recommendations will be accommodated. *See* § 2590.702(f)(4)(v).

29.     The Departments provided valuable insight into each of the criteria, reflecting their intent to operationalize the statute’s protections in a manner that both promotes health and prevents discriminatory practices under ERISA.

30.     Regarding the first criterion, “the once-per-year requirement was included as a bright-line standard for determining the minimum frequency that is consistent with a reasonable design for promoting good health or preventing disease.” 71 Fed. Reg. at 75018. The once-per-year requirement ensures that participants have a meaningful opportunity to participate in a reasonable alternative standard.

31.     A key requirement of the fourth criterion for outcome-based programs is that the “full reward” must be available to “all similarly situated individuals[,]” regardless of when they meet the reasonable alternative standard during the plan year. *See* Final Regulations, 33165.

Critically, the Departments clearly state that it is "[t]he intention of the Departments . . . that, regardless of the type of wellness program, *every individual* participating in the program should be able to receive the ***full amount of any reward or incentive*. . .." *Id.* (emphases added). While plans have flexibility in determining the manner in which they provide the "full reward," providing the "full reward" to every participant is ***mandatory***, regardless of when the participant satisfies the alternative standard. The Departments have made this clear:

> While an individual may take some time to request, establish, and satisfy a reasonable alternative standard, ***the same, full reward must be provided to that individual as is provided to individuals who meet the initial standard for that plan year***. (For example, if a calendar year plan offers a . . . premium discount and an individual . . . satisfies that alternative on April 1, the plan or issuer must provide the premium discounts for January, February, and March to that individual.) Plans and issuers have flexibility to determine ***how*** to provide the portion of the reward corresponding to the period before an alternative was satisfied (e.g., payment for the retroactive period or pro rata over the remainder of the year) ***as long as . . . the individual receives the full amount of the reward***.

Final Regulations, 33163 (emphases added).

32.    The Final Regulations provide an example of a non-compliant plan that imposes a tobacco use surcharge but does not facilitate the participant's enrollment in, or participation in, a smoking cessation program. *See id.*, Example 8. Instead, the employer advises the participant to find a program, pay for it, and provide a certificate of completion. *Id.* The Final Regulations conclude that the plan is not compliant because it "has not offered a reasonable alternative standard . . . and the program fails to satisfy the requirements of paragraph (f) of this section." *Id.*; Final Regulations, 33180.

33.    For health-contingent wellness programs, the Final Regulations require that the notice be disclosed "in *all* plan materials describing the terms of" the program. 42 U.S.C. § 300gg-4(j)(3)(E); 45 C.F.R. § 146.121(f)(4)(v) (emphasis added). Further, the Final Regulations establish

that "[f]or ERISA plans, wellness program terms (including the availability of any reasonable alternative standard) are generally required to be disclosed in the summary plan description (SPD), as well as in the applicable governing plan documents . . . if compliance with the wellness program affects premiums . . . under the terms of the plan." Final Regulations, 33166. Plans that charge their participants more and fail to inform participants of a reasonable alternative standard to the surcharge violate these requirements.

### C. Crown's Tobacco Surcharge Program.

34.     Crown sponsors and administers the Plan, which is a self-funded employer group health plan that provides medical benefits to Crown's eligible employees and their dependents.

35.     Crown charges a $100 surcharge[5] per month per tobacco-user. If both an employee and his or her enrolled spouse are tobacco users, the surcharge is $200 per month. For weekly-paid employees, the surcharge is deducted across the first four pay periods of each month—$25.00 per pay for a single tobacco-user surcharge and $50.00 per pay if both employee and spouse are tobacco users.

36.     Crown distributes a "Tobacco Surcharge Frequently Asked Questions" document (the "FAQ") to participants that describes the terms of the surcharge program. The FAQ defines a "tobacco user" as an employee or spouse who has "used tobacco or nicotine products an average of four or more times per week within the past six months." Crown requires participants to recertify their tobacco-use status annually during open enrollment. The FAQ states that "[a]ll employees enrolled in the Medical Program must recertify their tobacco use status annually during open

---

[5] Note, certain Plan materials indicate that the surcharge is $70.

enrollment." If a participant does not complete the tobacco-use affidavit during open enrollment, the surcharge is withheld automatically from his or her pay.

37.     Crown's FAQ identifies three purported paths by which a participant may avoid or terminate the surcharge during the plan year: (a) changing tobacco-use status by achieving six months of tobacco-free use; (b) completing an "approved smoking cessation program"; or (c) obtaining a medical waiver from a physician. Each path, as constructed by Crown, fails to satisfy the full reward rule.

## II.     DEFENDANTS CANNOT AVAIL THEMSELVES OF ERISA'S SAFE HARBOR

38.     Crown's wellness program does not make the full reward available to all similarly situated participants. ERISA and the regulations require that the *full* reward be "ma[d]e available to all similarly situated individuals." 42 U.S.C. § 300gg-4(j)(3)(D) and 29 C.F.R. § 2590.702(f)(4)(iv). The Departments make clear that a participant who satisfies a reasonable alternative standard must "receive[] the full amount of the reward." 78 Fed. Reg. at 33163. Crown's program does not do that.

39.     The Crown FAQ states expressly that if a participant changes tobacco-use status during the year, "[t]he surcharge will be removed going forward. ***Refunds for past payroll deductions are not issued***." Crown treats every surcharge dollar collected prior to the participant's recertification as a windfall to the Plan and refuses to disgorge it, in direct violation of the full reward rule.

40.     The completion of an approved cessation program suffers from the same defect. The FAQ states that "[u]pon providing a certificate of completion, the surcharge will be removed for the remainder of the plan year." It further provides that the participant "will be required to

17

recertify [his or her] tobacco use status before the next plan year begins," and that if the participant "cannot certify as tobacco-free, the surcharge will apply again beginning in January." At no point does Crown provide for the return of surcharges collected before the certificate of completion is issued.

41.     The medical waiver path suffers from the same defect. The FAQ states that if a participant obtains a medical waiver, the participant "may avoid the tobacco surcharge for the remainder of the current plan year." Once again, the reward is prospective only; the surcharges collected between January and the participant's successful waiver are retained by Crown. Because a participant who completes an alternative standard is April cannot recover the surcharges paid in January, February, and March in direct contravention of the explicit direction from the Departments. *See* 78 Fed. Reg. at 33163. Crown retains the January, February, and March surcharges as an untouched windfall while merely halting future collections.

42.     As a result, Crown's program creates two classes of similarly situated participants who receive materially different rewards under the Plan. Participants who satisfy the operational timing requirements of the annual-enrollment certification—either because they were never tobacco users or because they achieved six months of tobacco-free status before open enrollment— receive the full annual reward. Participants who satisfy the alternative standard during the plan year receive only the reward for the remainder of the plan year and pay a full surcharge for the intervening months. That is precisely the disparity 29 C.F.R. § 2590.702(f)(4)(iv) forbids.

43.     Crown's materials also fail to provide the required notice. The statute and regulations require that "in all plan materials describing the terms of" the program, the plan must disclose the availability of a reasonable alternative standard, provide contact information for

18

obtaining it, and state that "recommendations of an individual's personal physician will be accommodated." 29 C.F.R. § 2590.702(f)(4)(v). Crown's materials fall short of this standard.

44.    The Crown FAQ describes an alternative standard (e.g., completion of an approved smoking cessation program) but does not disclose that satisfying that alternative standard entitles the participant to the *full* reward under the Plan, either prospectively, pro rata, or retroactively. To the contrary, the FAQ affirmatively misinforms participants that "[r]efunds for past payroll deductions are not issued" and that the surcharge will be removed only "for the remainder of the plan year." That is not a disclosure of the *reasonable* alternative standard. The Crown FAQ likewise fails to disclose that "recommendations of an individual's personal physician will be accommodated". 29 C.F.R. § 2590.702(f)(4)(v). The FAQ references a medical waiver process (i.e., a limited exception for participants for whom quitting is "unreasonably difficult" or "medically inadvisable") but ties that process to a physician's certification of "a health condition" and further conditions the waiver on completion of an alternative program that Crown may impose. That is not the physician-accommodation disclosure required by the regulation.

45.    Upon information and belief, Crown distributes additional participant-facing materials describing the terms of the tobacco surcharge, including the SPD, open enrollment communications, and materials explaining the operational mechanics of the surcharge, that likewise fail to comply with the notice requirement, including by omitting the physician-accommodation statement and by failing to disclose that satisfying an alternative standard entitles the participant to the full reward. Plaintiff reserves the right to identify additional deficient materials during discovery.

46.    These omissions independently violate ERISA's wellness program regulations and preclude Crown from invoking the statutory safe harbor for health-contingent wellness programs. By presenting the tobacco-related premium differential without making available the full reward and by failing to disclose "in all plan materials" discussing the surcharge all the avenues for obtaining the full reward, including the physician-accommodation process, Crown's wellness program is opaque, inaccessible, and administered in a manner that deters participation rather than promoting health. Upon information and belief, Crown likewise fails to provide compliant notice in other participant-facing communications describing or implementing the tobacco-related premium differential.

47.    ERISA requires that outcome-based wellness programs tied to tobacco use be reasonably designed to improve health, uniformly available to all similarly situated individuals, and supported by a reasonable alternative standard that affords the same full reward regardless of when the participant satisfies the alternative during the plan year. The regulations also require clear notice. Crown's program, as communicated in its own materials, fails these mandates. Not only does Crown fail to make available the full reward but it fails to clearly notify participants, as required by ERISA and the regulations.

48.    Crown should have made available to participants an avenue to obtain the full reward, as required. It should have provided clear and explicit disclosure that participants who could not satisfy the initial tobacco-use standard had the right to pursue a reasonable alternative standard that would make available the full reward, including a refund of surcharges paid during the period before completion, as well as an additional option to participate in an alternative standard directed by a participant's personal physician. Crown should have identified that alternative standard in concrete terms, explained the right to a physician-directed accommodation,

and informed participants that completion of that alternative during the Plan year would entitle the participant to a refund of surcharges paid during the period before completion. Had Crown provided this information in its participant-facing materials, participants like Plaintiff may have understood that they had viable options to avoid the surcharge and may have taken timely steps to obtain the premium relief to which they were entitled under ERISA's wellness program regulations.

49.    Plaintiff paid the tobacco surcharge of $100 per month during the 2025 Plan year. Plaintiff was not told by Crown or anyone acting on its behalf that completing the cessation program would result in relief from the surcharge for the Plan year in which the surcharge was imposed; was never informed that the cessation program operated as a "reasonable alternative standard" within the meaning of 29 C.F.R. § 2590.702(f); and was never told that she had the right to a physician-directed alternative standard accommodating a participant's personal physician's recommendations. Crown's failure to disclose all available avenues to avoid or mitigate the surcharge, including the entitlement to a refund of surcharges already paid, deprived Plaintiff and other participants of the information necessary to make informed benefit decisions and independently disqualifies the Plan from ERISA's wellness program safe harbor.

50.    The lack of compliant alternative standards, coupled with deficient disclosures, reflects a program designed and administered in such a way as to be more for revenue generation and cost shifting than for bona fide health promotion. By omitting material information and required disclosures, Crown deprived participants of the ability to make informed choices about their health coverage and financial obligations, violating the regulatory framework governing wellness programs and ERISA's fiduciary duties of loyalty and prudence.

21

51.     Allowing entities like Crown to exploit their participants and unlawfully extract substantial sums from them without making available a compliant wellness program transforms the surcharge into a "subterfuge for discrimination" and undermines ERISA's purpose of protecting workers from health-based discrimination. If unchecked, this practice would permit employers to manipulate wellness programs as revenue-generating schemes rather than genuine health initiatives, shifting unjust financial burdens onto employees in violation of federal law. This type of conduct violates not only ERISA's anti-discrimination rules governing wellness programs but also the statute's fiduciary duties of loyalty and prudence, as Crown failed to administer the Plan solely in the interest of participants

### III.    DEFENDANT'S SELF-DEALING AND MISMANAGEMENT OF PLAN FUNDS

52.     Crown treats the tobacco surcharge as a Plan contribution. Crown withholds the surcharge ($100 per month, or $25 per weekly pay period) from participants' paychecks alongside their other premium contributions and treats those amounts as part of the funding stream for Plan coverage.

53.     Crown administered the tobacco surcharge by designating which participants would be charged and withholding the premium differential directly from participants' paychecks as a Plan contribution, alongside required premium deductions. These deductions are part of the funding stream for Plan coverage, not separate penalties, and are treated the same way as other contributions made to support the Plan's medical benefits.

54.     Crown's participant enrollment materials confirm the dual-funding structure of the Plan. Crown discloses to participants that "[t]he company pays all or a portion of the cost of your coverage under certain benefit programs, while you pay the full cost for other benefit programs." The SPD identifies the Crown Medical Program as a shared-cost benefit program (i.e., one for

which Crown pays a portion and participants pay the balance through payroll deductions) and separately indicate that the Medical Program imposes a surcharge on employees and spouses who use tobacco. Upon information and belief, the Plan is a self-funded ERISA-covered welfare benefit plan.

55.    The SPD makes clear that medical coverage is funded by both employer and participant contributions. Upon information and belief, Crown commits a defined company contribution amount toward the cost of coverage for each participant tier, with participants paying the balance. By layering a tobacco surcharge on top of those required participant contributions, Crown created what should have been a third stream of funding available to the Plan: (1) participants' required premium contributions, (2) Crown's promised company contribution, and (3) the additional tobacco surcharge. But instead of allowing all three funding streams to flow into the Plan, Crown deposited the surcharge funds in its own accounts and, upon information and belief, used that money to offset or reduce its own funding obligation. Because the cost of coverage for each tier is fixed, every dollar of surcharge collected reduced the company's contribution dollar-for-dollar. Thus, rather than increasing resources available to the Plan, the surcharge simply shifted costs away from Crown and onto participants.

56.    Once the surcharge amounts were withheld from wages, they constituted Plan assets under 29 C.F.R. § 2510.3-102 and were required to be administered "solely in the interest" of participants and beneficiaries under 29 U.S.C. § 1104(a)(1). Upon information and belief, Crown failed to deposit the tobacco-surcharge amounts into the Plan's assets in full and instead used those amounts to offset, dollar-for-dollar, its own required company contributions, and to retain float and interest in its corporate accounts until such offset occurred.

57.     This practice constitutes classic self-dealing because Defendant used the mechanisms of the Plan to realize savings for the company, depriving the Plan of the full benefit of the three distinct funding streams it should have received. Defendant's actions caused the Plan to lose the very employer contributions it was otherwise supposed to receive, in violation of ERISA's fiduciary duty standards.

58.     In doing so, Defendant failed to act solely in the interest of participants and beneficiaries, as ERISA requires. Rather than use the surcharge proceeds to, for example, offset the premiums of non-smokers, Defendant used the funds to save money for the company. Upon information and belief, the money that Crown did not have to contribute to the Plan sat in its accounts and earned interest, while the Plan was deprived of the full amount of funding it should have received, stripping the Plan of employer dollars it was owed and converting those savings into financial benefit for Crown. This diversion of funds is self-dealing, violates the duty of loyalty, and constitutes a prohibited transaction under 29 U.S.C. §§ 1104 and 1106.

59.     By layering a $25 weekly (or $100 monthly) tobacco surcharge on top of participants' required medical premium contributions, Defendant created what should have been a third stream of funding into the Plan: (i) participants' required medical premium contributions; (ii) Crown's promised Employer contribution; and (iii) the additional tobacco surcharge. Instead of allowing all three streams to flow into the Plan as a benefit to participants, Defendant used the tobacco surcharge to offset and reduce its own funding obligation. Because the cost of coverage for each tier is fixed at the start of each Plan Year, every dollar of surcharge collected reduced the company's contribution dollar-for-dollar. The surcharge did not increase resources available to the Plan; it simply shifted costs away from Crown and onto participants.

60.     Even apart from this diversion, Crown separately breached its fiduciary duties through the administration of the tobacco-surcharge program itself. The program fails to make available the "full reward" to participants who complete the cessation program, omits required disclosures from the materials participants actually rely on during enrollment, and conditions even baseline qualification as a non-tobacco user on a six-month look-back period that participants must self-certify. By maintaining and communicating a noncompliant wellness program, year after year, and by failing to monitor the terms of the Plan and the wellness program and correct these defects, Crown acted imprudently and misled participants about their rights under ERISA.

<strong><u>CLASS DEFINITION AND ALLEGATIONS</u></strong>

61.     Plaintiff brings this action individually and on behalf of all other similarly situated individuals, pursuant to Rule 23(b)(1) of the Federal Rules of Civil Procedure.

62.     Plaintiff proposes the following Class definitions, subject to amendment as appropriate:

> **Tobacco Surcharge Class**
> All individuals residing in the U.S. who, during the relevant time period, paid a tobacco surcharge in connection with their participation in a health or welfare plan offered by Defendants.

63.     Excluded from the Class are Defendant's officers and directors. Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

64.     The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a) and (b)(1).

65.     **<u>Numerosity</u>**. This action is appropriately suited for a class action. The members of the Class are so numerous that the joinder of all members is impracticable. Plaintiff is informed,

25

believes, and thereon alleges, that the proposed Class contains thousands of participants who have been damaged by Defendant's conduct as alleged herein, the identity of whom is within the knowledge of Defendant and can be easily determined through Defendant's records.

66.    **Commonality**. This action involves questions of law and fact common to the Class. The common legal and factual questions include, but are not limited to, the following:

a. Whether Defendant's tobacco surcharge discriminates against participants based on a health status related factor;

b. Whether Defendant makes available a reasonable alternative standard by which a participant could receive the "full reward" of the tobacco surcharge;

c. Whether Defendant provided the required notice in ***all*** the Plan materials describing the surcharge;

d. Whether Defendant provided the required statement that participants' personal physicians' recommendations would be accommodated in all Plan materials describing the surcharge;

e. Whether Defendant's wellness program violates ERISA and the Final Regulations;

f. Whether Defendant breached its fiduciary duties by collecting and retaining the tobacco surcharge to offset their own contributions to the Plan;

g. Whether Defendant breached its fiduciary duties by administering the Plan that refuses to reimburse participants who complete an alternative standard;

h. Whether Defendant breached its fiduciary duties by failing to periodically review the terms of its wellness program and the communications sent to participants to ensure compliance with ERISA and applicable regulations;

i. The appropriate mechanisms to determine damages on a class-wide basis.

67.    **Typicality**. Plaintiff's claims are typical of the claims of the members of the Class, because, *inter alia*, all Class members have been injured through the uniform misconduct described above and were charged improper and unlawful tobacco surcharges. Moreover, Plaintiff's claims are typical of the Class members' claims because Plaintiff is advancing the same claims and legal theories on behalf of herself and all members of the Class. In addition, Plaintiff is entitled to relief under the same causes of action and upon the same facts as the other members of the proposed Class.

68.    **Adequacy of Representation**. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff and members of the Class each participated in health and welfare plans offered by Defendant and were harmed by Defendant's misconduct in that they were assessed unfair and discriminatory tobacco surcharges. Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained competent counsel experienced in complex litigation and class action litigation. Plaintiff has no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff.

69.    Plaintiff seeks declaratory and equitable relief on grounds generally applicable to the Class. Unless the Class is certified, Defendant will be allowed to profit from their unfair and discriminatory practices, while Plaintiff and the members of the Class will have suffered damages. Unless Class-wide declaratory relief is issued, Defendant may continue to benefit from the violations alleged, and the members of the Class will continue to be unfairly treated.

## CAUSES OF ACTION

### COUNT I
### UNLAWFUL SURCHARGE – FAILURE TO MAKE AVAILABLE A REASONABLE ALTERNATIVE STANDARD
### (Violation of 29 U.S.C. § 1182(b) and 42 U.S.C. § 300gg-4(j)(3)(D); 29 C.F.R. § 2590.702(f)(4)(iv))

70.    Plaintiff re-alleges and incorporates herein by reference allegations 1–69 of this Complaint.

71.    Defendant unlawfully imposes a tobacco surcharge on all participants who use tobacco in violation of ERISA § 702. By imposing discriminatory surcharges of $100 monthly on participants (and their spouses) who use tobacco, without complying with the statutory and regulatory requirements, Defendant is violating ERISA § 702(b), 29 U.S.C. § 1182(b)(1), and 29 C.F.R. § 2590.702(f)(4).

72.     ERISA prohibits group health plans from charging participants more for coverage based on a health-related factor. 29 U.S.C. § 1182(b)(1); 42 U.S.C. § 300gg-4(b)(1). A tobacco surcharge is therefore unlawful unless the plan satisfies *each* condition of the narrow wellness-program exception. *Id.* §§ 1182(b)(2)(B), 300gg-4(b)(2)(B). Tobacco use is a health-related factor. To qualify for the safe-harbor exception under ERISA, a health-contingent, outcome-based wellness program such as Crown's tobacco surcharge program must satisfy every requirement set forth in 29 C.F.R. § 2590.702(f)(4), including the requirement that the full reward be available to all similarly situated individuals.

73.     Among those mandatory conditions, a plan must make the same, full reward available to every participant who satisfies a reasonable alternative standard. 42 U.S.C. § 300gg-4(j)(3)(D); 29 C.F.R. § 2590.702(f)(4)(iv). The full reward requirement is a rule of uniform economic treatment: participants who satisfy the alternative standard must receive the same reward made available to similarly situated participants who satisfy the Plan's initial tobacco-use standard, not a prorated, prospective, or otherwise diminished portion of that reward.

74.     Crown's program fails the full reward requirement of 29 C.F.R. § 2590.702(f)(4)(iv) and 42 U.S.C. § 300gg-4(j)(3)(D). Because Crown refuses to reimburse participants who satisfy an alternative standard, Crown's program creates two classes of similarly situated tobacco-free participants who receive materially different rewards under the Plan: (1) participants who certify as tobacco-free at open enrollment receive the full annual reward and (2) participants who satisfy an alternative standard during the plan year—by achieving six months of tobacco-free status, completing an approved cessation program, or obtaining a medical waiver—receive only the reward for the remainder of the plan year and pay a full surcharge for the intervening months.

75.    Crown's own participant-facing Plan materials confirm this defect: "[t]he surcharge will be removed going forward. Refunds for past payroll deductions are not issued." This is a facial admission that Crown does not provide the full reward in any manner that satisfies 29 C.F.R. § 2590.702(f)(4)(iv). *See* 78 Fed. Reg. at 33163 (explaining that the full year's worth of surcharges is the meaning of "full reward").

76.    Because Defendant's surcharge program does not satisfy the criteria that plans must comply with to qualify as a compliant "program[] of health promotion or disease prevention," Defendant cannot qualify for the statutory safe harbor. The tobacco surcharge is, therefore, unlawful and discriminatory. *See* 29 U.S.C. § 1182(b) and 42 U.S.C. § 300gg-4(b).

77.    As a direct and proximate result of Defendant's violations, Plaintiff and the Class have suffered economic loss in the form of the tobacco surcharge paid, together with lost time-value of money and other consequential damages.

78.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes Plaintiff and Class Members to seek appropriate equitable relief to enjoin Defendant's unlawful practices, redress Defendant's violations, and enforce ERISA and the terms of the Plan. Plaintiff and Class Members are therefore entitled to appropriate equitable relief, including restitution, disgorgement, surcharge, an accounting, declaratory and injunctive relief, and such other relief as the Court deems just and proper.

<u>COUNT II</u>
**UNLAWFUL TOBACCO SURCHARGE - FAILURE TO PROVIDE
REQUIRED NOTICE
(Violation of 29 U.S.C. § 1182(b), and 42 U.S.C. § 300gg-4(j)(3)(E); 29 C.F.R.
§ 2590.702(f)(4)(v))**

79.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

80.    Defendant's tobacco surcharge program is not and was not a permissible wellness program because it failed to provide proper notice of the availability of a *reasonable* alternative standard, in violation of 42 U.S.C. § 300gg-4(j)(3)(E) and 29 C.F.R. § 2590.702(f)(4)(v).

81.    The statute and regulations require Plan materials describing the surcharge to disclose "the availability of a *reasonable* alternative standard." 42 U.S.C. § 300gg-4(j)(3)(E) (emphasis added); 29 C.F.R. § 2590.702(f)(4)(v). The cessation program Defendant identifies in the SPD is, on its face, an alternative standard; however, it is not a *reasonable* one. To be reasonable, an alternative standard must provide "the same, full reward" as is provided to participants who satisfy the initial tobacco-free standard, regardless of when the participant satisfies the alternative during the Plan year. *See* 78 Fed. Reg. at 33163; 29 C.F.R. § 2590.702(f)(4)(iv). The alternative Defendant specifies does not. It eliminates the surcharge only prospectively, with no disclosed mechanism for the participant to recover surcharges already deducted from his or her paychecks during the months it takes to enroll in, attend, and complete the program. Because the alternative Defendant identifies in the materials describing the surcharge does not make the full reward available, Defendant has not disclosed a *reasonable* alternative standard at all, and the notice fails as a matter of law.

82.    As detailed herein, Crown's materials describe the terms of the tobacco surcharge program but fail to satisfy the notice requirement. The Crown FAQ identifies smoking cessation as a purported alternative standard but does not disclose that satisfying it entitles the participant to the *full* reward. To the contrary, the FAQ affirmatively misinforms participants that "[r]efunds for past payroll deductions are not issued." The alternative Crown identifies is, at best, an alternative

30

standard, but it is not a *reasonable* alternative standard, because it does not make available the full reward as ERISA requires. The SPD likewise is deficient in its explanation of the surcharge program.

83.     Further, neither the Crown FAQ nor the SPD include the required disclosure that "recommendations of an individual's personal physician will be accommodated." 29 C.F.R. § 2590.702(f)(4)(v). The FAQ references a limited medical-waiver process available only where quitting is "unreasonably difficult" or "medically inadvisable" and only upon a physician's certification of a specific "health condition," and further conditions the waiver on completion of an alternative program at Crown's discretion. The SPD provides the same. That is not the broad physician-accommodation disclosure the regulation requires. Instead, it describes a narrow, conditional waiver process that requires participants to prove a specific "health condition" to a physician before they may qualify, which is materially different from the regulation's required disclosure that a participant's personal physician's recommendations will be accommodated.

84.     Upon information and belief, Crown distributes additional participant-facing materials describing the tobacco surcharge and the premium differential, including enrollment materials like benefit guides, that fail to comply with the notice requirement, including by omitting the physician-accommodation statement and by failing to disclose that satisfying an alternative standard entitles the participant to the full reward. Plaintiff reserves the right to identify additional deficient materials during discovery

85.     As a result of these deficiencies, Crown cannot take advantage of the statutory safe harbor, and the surcharge functions as a penalty rather than a compliant wellness incentive. Deficient and misleading notice is a fundamental violation of ERISA's core anti-discriminatory

purpose: ensuring that participants have a fair and compliant opportunity to be treated the same as non-smokers.

86.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: (A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan. *See* 29 U.S.C. § 1182(b). Because Defendant's surcharge program does not satisfy the criteria that plans must comply with to qualify as a compliant "program[] of health promotion and disease prevention," Defendant cannot qualify for the statutory safe harbor and the tobacco surcharge is, therefore, unlawful and discriminatory. Plaintiff and Class Members are entitled to relief under ERISA § 502(a)(3).

### COUNT III
### BREACH OF FIDUCIARY DUTY AND PROHIBITED TRANSACTIONS
### (PLAN-LEVEL RELIEF)
### (Violation of ERISA §§ 404, 406 and 409, 29 U.S.C. §§ 1104, 1106 and 1109)
### (Brought Under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2))

87.    Plaintiff re-alleges and incorporates herein by reference all prior allegations of this Complaint.

88.    ERISA requires a fiduciary to act "solely in the interest of participants," to do so with "the care, skill, prudence, and diligence" of a prudent person, "in accordance with the documents and instruments governing the plan," and to refrain from "deal[ing] with the assets of the plan" in the fiduciary's own interest. 29 U.S.C. §§ 1104(a)(1), 1106(b)(1). These duties of loyalty and prudence are the "highest known to the law" and require fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

32

89.     At all relevant times, Defendant was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority and discretionary responsibility in the management and administration of the Plan and the management and disposition of Plan assets.

90.     Outside of its role as Plan sponsor, Crown exercised fiduciary discretion in the administration of the Plan and its assets after the Plan was designed in the collection, handling, and disposition of surcharge proceeds, which became Plan assets upon collection from participants (*see* 29 C.F.R. § 2510.3-102) and in the ongoing monitoring (or failure to monitor) the Plan's administration to ensure compliance with ERISA over multiple Plan Years.

91.     On information and belief, Defendant used Plan assets (i.e., the surcharge proceeds withheld from participants' paychecks) to offset, dollar-for-dollar, Crown's own funding obligations to the Plan, rather than depositing and retaining those Plan assets in trust to fund benefits and accumulate reserves. Crown's SPD confirms the dual-funding structure stating that Crown shares in the cost of coverage and participants pay the rest. Thus, the surcharge is a Plan contribution, subject to the same fiduciary duties that govern any other Plan asset. Defendant breached its fiduciary duties by assessing and collecting the surcharge in violation of federal law and the Plan's own terms and then applying those amounts to reduce, dollar-for-dollar, Crown's own funding obligations. Upon information and belief, Crown further profited by retaining the surcharge amounts in its own corporate accounts, earning float and interest, before those amounts were used to reduce Crown's funding obligation. The resulting harm is a Plan-level harm: the Plan received less employer funding than the Plan's funding structure required, because participant contributions were used to satisfy a share of Crown's obligation to fund Plan benefits.

92. Defendant further breached the duty of loyalty by preparing and disseminating participant-facing materials that described the wellness program but omitted material information ERISA requires in all plan materials describing the wellness program, including a statement that the recommendations of an individual's personal physician will be accommodated. *See* 29 C.F.R. § 2590.702(f)(4)(v); 42 U.S.C. § 300gg-4(j)(3)(E). As a fiduciary of the Plan, Defendant had a duty to communicate truthfully and completely about the Plan's terms in *every* participant-facing material describing the program. Enrollment and benefit guides are documents participants consult at open enrollment to make their tobacco-user election. Defendant's omissions from those documents deprived participants of the information necessary to make a fully informed election or to pursue an alternative path to the full reward.

93. Year after year, Crown failed to conduct periodic, prudent reviews of the wellness program's design and its participant-facing communications to ensure compliance with ERISA. Instead, it allowed a deficient program that produced disparate treatment among similarly situated tobacco users to persist year after year, despite its discriminatory effect and clear inconsistency with the full reward rule.

94. Crown further breached its fiduciary duties by administering a Plan that did not conform with ERISA's anti-discrimination requirements. It acted disloyally by permitting surcharge funds to offset Crown's own funding obligations and by maintaining a program that did not make available the full reward to participants, including Plaintiff, in direct violation of 42 U.S.C. § 300gg-4(j)(3)(D) and 29 C.F.R. § 2590.702(f)(4)(iv). It also failed to include the notice required by 29 C.F.R. § 2590.702(f)(4)(v). These omissions and design choices are incompatible with ERISA's fiduciary mandates of loyalty, prudence, and adherence to governing law.

95.     As a result of these breaches, Crown was unjustly enriched at the expense of the Plan and its participants. By deducting surcharges directly from employees' paychecks without administering a compliant wellness program or providing full-year reimbursement, Crown secured financial savings for itself while shifting costs to participants. The structure and administration of the program ensured that not all "similarly situated individuals" could receive the full reward, and participants were deprived of clear notice of the reasonable alternative standard. In effect, Defendant converted employee contributions (i.e., Plan assets) into a source of corporate savings, in violation of 29 U.S.C. § 1104(a)(1)(A).

96.     By withholding unlawful surcharges and using those funds to offset Crown's financial obligations, Defendant caused the Plan to engage in transactions constituting a direct or indirect transfer of Plan assets for the benefit of a party-in-interest—namely, itself—in violation of 29 U.S.C. § 1106(a)(1). Crown is a party-in-interest under 29 U.S.C. § 1002(14) because it is both the Plan sponsor and a fiduciary exercising discretionary authority over the Plan's administration and finances.

97.     Crown's conduct caused harm to the Plan. The Plan was deprived of assets that should have been deposited, retained, invested, and used to fund benefits and accumulate reserves for participants. Instead, those assets were used to reduce Crown's own corporate contribution obligation. The Plan also suffered an opportunity-cost loss. Had Crown either refrained from collecting unlawful surcharge amounts or treated those amounts as supplemental Plan funding rather than as a substitute for its own contribution obligation, the Plan would have held more assets, accumulated greater reserves, and maintained a stronger funding base.

98.     Crown also obtained wrongful profits from its use of Plan assets. The savings Crown achieved by offsetting its own actuarially determined contribution obligation were profits

made through the use of Plan assets. Upon information and belief, Crown also benefited from the float earned on the extra funds it had in its accounts. Under ERISA § 409(a), Crown is liable to "restore to such plan any profits of such fiduciary which have been made through use of assets of the plan." 29 U.S.C. § 1109(a).

99.     As a direct and proximate result of these fiduciary breaches, Plaintiff seeks Plan-wide relief under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2). Defendant is liable to make good to the Plan all losses resulting from its breaches, restore all profits obtained through the use of Plan assets, disgorge the corporate savings Crown achieved by offsetting its own contribution obligations, and provide other appropriate equitable relief, including an accounting, constructive trust, equitable lien, and removal or replacement of fiduciaries who breached their duties. *See* 29 U.S.C. § 1109(a).

**COUNT IV**
**BREACH OF FIDUCIARY DUTY (INDIVIDUAL RELIEF)**
**(Violation of ERISA §§ 404 and 406, 29 U.S.C. §§ 1104 and 1106)**

100.    Plaintiff re-alleges and incorporates herein by reference each preceding allegation of this Complaint as if fully set forth herein.

101.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant to seek individualized equitable relief for a fiduciary's breach of duty. Defendant breached its fiduciary duties by collecting unlawful tobacco surcharges from participants, treating those amounts as Plan assets, and using them to reduce the Company's own contribution obligations rather than administering them solely for the benefit of participants and beneficiaries. That same conduct also constituted prohibited transactions under 29 U.S.C. § 1106(a)(1)(D) and § 1106(b)(1), because Crown used Plan assets for its own benefit.

36

102.    Plaintiff suffered individualized harm from Crown's conduct. She paid tobacco surcharges that should not have been imposed. She was also deprived of the benefit of having those contributions deposited, retained, and used in the Plan's trust to fund benefits and accumulate reserves solely in participants' interests. Because the Plan's funding structure ties participant contributions to the Plan's assets, reserves, and expected benefit obligations, Plaintiff also bore higher contribution costs and increased risk of future cost increases or benefit reductions.

103.    Plaintiff and the Class therefore seek individualized equitable relief under 29 U.S.C. § 1132(a)(3). That relief includes equitable restitution of unlawfully collected surcharge amounts traceable through Defendant's handling and commingling of Plan funds; disgorgement of profits and corporate savings Crown obtained through its use of Plan assets; an accounting of all surcharge amounts collected and used to offset Crown's contribution obligations; imposition of a constructive trust or equitable lien over funds wrongfully retained by Crown; and declaratory relief prohibiting Crown from continuing to administer a noncompliant wellness program or using Plan assets to reduce its own contribution obligations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Defendant on all claims and requests that the Court award the following relief:

A.  An Order certifying this action as a class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as Class representative for the Class, and appointing the undersigned to act as Class Counsel;

B.  A declaratory judgment that the unlawful and discriminatory tobacco surcharges imposed on participants violate ERISA's anti-discrimination provisions set forth in ERISA § 702, 29 U.S.C. § 1182;

37

C.  An Order instructing Defendant to reimburse all persons who paid the unlawful and discriminatory surcharge;

D.  A declaratory judgment that Defendant breached its fiduciary duties in violation of ERISA § 404, 29 U.S.C. § 1104 for, *inter alia*, instituting a surcharge on participants without offering a reasonable alternative standard in violation of ERISA's anti-discrimination provisions and for failing to notify participants of an alternative standard, and for failing to adequately monitor the terms of the Plan, the surcharge, and the wellness program, as well as communications with participants, to ensure they complied with ERISA and the applicable regulations;

E.  An Order requiring Defendant to provide an accounting of all prior payments of the surcharges under the Plan;

F.  Declaratory relief as necessary and appropriate, including an Order that Defendant's program was unlawful and that Defendant should not further violate the duties, responsibilities, and obligations imposed on it by ERISA with respect to the Plan and ordering Defendant to remit all previously collected surcharges;

G.  Disgorgement of any benefits or profits Defendant received or enjoyed due to the violations of ERISA § 702, 29 U.S.C. § 1182(b);

H.  Restitution of all surcharge amounts Defendant collected;

I.  Surcharge from Defendant totaling the amounts owed to participants and/or the amount of unjust enrichment obtained by Defendant as a result of its collection of the unlawful and discriminatory tobacco surcharges;

J.  Relief to the Plan from Defendant for its violations of ERISA § 404, 29 U.S.C. § 1104, under 29 U.S.C. § 1109, including a declaration that the tobacco surcharges are

38

unlawful; restoration of losses to the Plan and its participants caused by Defendant's fiduciary violations; disgorgement of any benefits and profits Defendant received or enjoyed from the use of the Plan's assets or violations of ERISA; surcharge; payment to the Plan of the amounts owed to members who paid the surcharges; removal and replacement of the Plan's fiduciaries, and all appropriate injunctive relief, such as an Order requiring Defendant to stop imposing the unlawful and discriminatory surcharges on participants in the future.

K. An award of pre-judgment interest on any amounts awarded to Plaintiff and the Class pursuant to law;

L. An award of Plaintiff's attorneys' fees, expenses, and/or taxable costs, as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

M. Any other relief the Court determines is just and proper.

Dated: July 10, 2026                    Respectfully submitted,


                                        /s/ Michael Connett
                                        _____

                                        Michael Connett (P311859)
                                        **SIRI & GLIMSTAD LLP**
                                        Oren Faircloth (*pro hac vice* forthcoming)
                                        William H. Payne (*pro hac vice* forthcoming)
                                        700 S Flower Street
                                        Suite 1000
                                        Los Angeles, CA 90017
                                        E: mconnett@sirillp.com
                                        E: ofaircloth@sirillp.com
                                        E: wpayne@sirillp.com

                                        *Attorneys for Plaintiff and the Proposed Class*